179 P.3d 1050

Michael A. PEROUTKA, Chuck Baldwin, and David P. Porter, Appellants–Appellants,

v.

Kevin B. CRONIN [1], Chief Election Officer, State of Hawai'i, Appellee–Appellee.

Ralph Nader, Peter Miguel Camejo, and Robert H. Stiver, Appellants

v.

Kevin B. Cronin, Chief Election Officer, State of Hawai'i.

No. 27233.

Supreme Court of Hawai'i.

March 27, 2008.

---

**1.** Pursuant to Hawai'i Rules of Appellate Procedure ("HRAP") Rule 43(c) (2005), Kevin B. Cronin has been substituted as a party to the instant appeal in place of Dwayne D. Yoshina, in his official capacity.

Eric A. Seitz, Honolulu, and Lawrence I. Kawasaki, on the briefs, for appellants-appellants Michael A. Peroutka, Chuck Baldwin, and David P. Porter and Ralph Nader, Peter Miguel Camejo, and Robert H. Stiver.

Aaron H. Schulaner and Holly T. Shikada, Deputy Attorneys General, on the briefs, for appellee-appellee Kevin B. Cronin, Chief Election Officer, State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and Circuit Judge ALM, in place of ACOBA, J., Recused.

Opinion of the Court by NAKAYAMA, J.

Appellants Michael A. Peroutka, Chuck Baldwin ("Peroutka/Baldwin"), David P. Porter ("Porter"), and Ralph Nader, Peter Miguel Camejo ("Nader/Camejo"), and Robert H. Stiver ("Stiver") (collectively, "Appellants"), appeal from the first circuit court's April 5, 2005 final judgments in favor of Appellee, Kevin B. Cronin ("Chief Election Officer").[2] The instant case is a consolidated

---

2. The Honorable Sabrina S. McKenna presided.

secondary appeal from the circuit court's April 5, 2005 judgments affirming the decisions of the Chief Election Officer. On appeal, Appellants present the following points of error: (1) the circuit court erred in determining that the procedures used in verifying signatures on Appellants nomination petitions are not unconstitutional; (2) the circuit court erred in determining that the review of Appellants' petitions by the Chief Election Officer was not arbitrary or capricious; and (3) the circuit court erred in determining that Appellants were provided a fair administrative hearing. For the reasons that follow, we affirm the circuit court's April 5, 2005 final judgments.

## I. BACKGROUND

On September 3, 2004, Peroutka/Baldwin and Nader/Camejo filed petitions with the Office of Elections to place their names on Hawaii's presidential ballot as president/vice president. On September 20, 2004, the Office of Elections issued a letter informing Appellants that they had failed to garner the requisite number of signatures necessary for inclusion on the presidential ballot. In proofing its calculations, the Office of Elections discovered that the numbers initially released needed to be revised. On September 24, 2004, the Office of Elections informed Appellants of its revised calculations.

### 1. *Nader/Camejo*

On September 23, 2004, Nader/Camejo filed a written request for a hearing, which began on September 29, 2004. Over the objection of Nader/Camejo, the Chief Election Officer presided over the hearing. Prior to the completion of the hearing, the parties reached a settlement. The terms of the settlement were as follows: (1) invalid signatures would be reviewed in the presence of a Nader/Camejo representative, who would be allowed to flag those signatures as to which the representative disputed the findings of the Office of Elections; (2) the flagged signatures would be reviewed by the Chief Election Officer, whose decision on whether or not to count the signatory "shall be final"; and (3) Nader/Camejo retained only the right to "challenge those Hawaii statutory or administrative rules that exceed those that are permissible under the U.S. Constitution or

federal statutes, ... as amended, or under the Hawaii Constitution."

The signature review process took place between October 7 and 12, 2004, and the Chief Election Officer reviewed the findings of the Office of Elections' staff and the signatures that were flagged. On October 18, 2004, the Chief Election Officer issued his findings and determined that Nader/Camejo had failed to gather the requisite number of valid signatures required by Hawai'i Revised Statutes ("HRS") § 11–113 (2004), and thus did not qualify for inclusion on Hawaii's presidential ballot. Nader/Camejo filed a timely notice of appeal to the circuit court on October 18, 2004.

### 2. *Peroutka/Baldwin*

On September 24, 2004, Peroutka/Baldwin filed a written request for a hearing. The hearing was held on September 30, 2004, and Peroutka/Baldwin objected to the Chief Election Officer's presiding over the hearing. The Chief Election Officer issued his Findings of Fact, Conclusions of Law, and Decision on October 5, 2004, which determined that Peroutka/Baldwin had failed to gather the requisite number of valid signatures required by HRS § 11–113, and thus did not qualify for inclusion on Hawaii's presidential ballot. Peroutka/Camejo filed a timely notice of appeal to the circuit court on October 18, 2004.

### 3. *Appeal before the circuit court*

On appeal before the circuit court, both Peroutka/Baldwin and Nader/Camejo raised identical arguments, as follows: (1) Appellants were not provided a fair administrative hearing before an impartial and unprejudiced election officer; (2) the administrative decision was arbitrary, capricious, and/or not based on any credible evidence; and (3) the practices and procedures used to count and determine the validity and sufficiency of the signatures were unconstitutional. On November 23, 2004, the circuit court filed its decision affirming the administrative decision of the Chief Election Officer. Therein the circuit court held: (1) that "it is not clear, manifest, and unmistakable that the relevant laws or procedures" used in verifying signa-

tures were unconstitutional, inasmuch as Appellants failed to rebut the presumption that the legislative enactments and statutory scheme at issue in the instant case are constitutional; (2) that the administrative rules and decisions were reasonable and not arbitrary or capricious; and (3) that Appellants failed to show either a pecuniary or institutional interest that would disqualify the Chief Election Officer from being involved in the administrative hearing.

On April 5, 2005, the circuit court filed its final judgments. On April 13, 2005, Appellants timely filed a joint notice of appeal.

## II. STANDARD OF REVIEW

### A. Secondary Administrative Appeal

■■■ "On secondary judicial review of an administrative decision, Hawai['']i appellate courts apply the same standard of review as that applied upon primary review by the circuit court." *Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations*, 70 Haw. 72, 80, 762 P.2d 796, 800-01 (1988). For administrative appeals, the applicable standard of review is set forth in Hawai'i Revised Statutes ("HRS") § 91-14 (2004), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91-14(g). Pursuant to HRS § 91-14(g)(5), administrative findings of fact are reviewed under the clearly erroneous standard, which requires this court to sustain its findings "unless the court is left with a firm and definite conviction that a mistake has been made." *Bumanglag v. Oahu Sugar Co., Ltd.*, 78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995) (block format and citation omitted). Administrative conclusions of law, however, are reviewed under the *de novo* standard inasmuch as they are "not binding on an appellate court." *Id.* (block format and citation omitted). "Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency." *Dole Hawaii Div.-Castle & Cooke, Inc. v. Ramil*, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). "To be granted deference, however, the agency's decision must be consistent with the legislative purpose." *Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984).

### B. Statutory Interpretation

■■■ "The constitutionality of a statute is a question of law that we review under the right/wrong standard." *Child Support Enforcement Agency v. Doe*, 109 Hawai'i 240, 246, 125 P.3d 461, 467 (2005) (citation omitted). Moreover, "[w]e have long held that: (1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *Id.* (citations and quotation marks omitted). However, this presumption "does not apply to laws which classify on the basis of suspect categories or impinge on fundamental rights expressly or impliedly granted by the constitution." *Id.* (citation omitted). When this occurs, "[s]uch laws are presumed to be unconstitutional unless the state shows compelling state interests which justify such classifications, and that the laws are narrowly drawn to avoid unnecessary abridgments of constitutional rights." *Id.* (citations and emphasis omitted).

## III. DISCUSSION

**A. Appellants' Assertion That Hawaii's Regulatory Framework Prescribing Signatory Requirements For a Presidential Candidate's Inclusion On a General Election Ballot Is Unconstitutional Is Deemed Waived Pursuant To Hawaiʻi Rules Of Appellate Procedure Rule 28(b)(7) (2005).**

Appellants assert that Hawaii's regulatory framework prescribing signatory requirements for a presidential candidate's inclusion on a general election ballot are unconstitutional because it deprived (1) them of their rights to be candidates and (2) the voters of the right to associate with a candidate of their choice.

HRS § 11–113(c)(2)(B) (1993) provides:

(c) All candidates for President and Vice President of the United States shall be qualified for inclusion on the general election ballot under either of the following procedures:

. . . .

(2) In the case of candidates of parties or groups not qualified to place candidates on the primary or general election ballots, the person desiring to place the names on the general election ballot shall file with the chief election officer not later than 4:30 p.m. on the sixtieth day prior to the general election:

. . . .

(B) A petition which shall be upon the form prescribed and provided by the chief election officer containing the signatures of currently registered voters which constitute not less than one per cent of the votes cast in the State at the last presidential election. The petition shall contain the names of the candidates, a statement that the persons signing intend to support those candidates, the address of each signatory, the date of the signer's signature and other information as determined by the chief election officer.

Pursuant to HRS § 11–113(c)(2)(B), the Chief Election Officer determined that the

minimum number of signatures of registered voters required to qualify for inclusion on Hawaii's 2004 general election ballot as president and vice president was 3,711. According to his September 20, 2004 letter, the Chief Election Officer informed Peroutka/Baldwin and Nader/Camejo that of their 7,195 and 7,184 signatures submitted, only 3,481 and 3,672 were valid, respectively. The number of valid signatures was revised lower in his September 24, 2004 letter, which stated that Peroutka/Baldwin had a revised 3,471 signatures, and Nader/Camejo had a revised 3,124 signatures. Because both campaigns did not meet the minimum number of valid signatures, the Chief Election Officer determined that neither campaign would be included in Hawaii's general election ballot.

■ In the instant case, Appellants do not contest whether the one percent signature requirement is constitutional.[3] Indeed, even though Appellants' point of error suggests that they are asserting that Hawaii's signatory requirements are unconstitutional, Appellants have not advanced any argument to that effect.

Instead, Appellants argue that because signatory restrictions implicate the fundamental right to candidacy, Hawaii's regulatory framework should be liberally construed in favor of the candidate. Specifically, their arguments are focused around the issue of whether the Chief Election Officer clearly erred in his implementation of Hawaii's signatory requirements, as follows: (1) it is clearly erroneous to reject signatures merely because they are illegible; (2) "although the Office of Elections requires that signatories provide their address and date of birth ... the examiners did not attempt to validate signatories by cross-referencing that information on the statewide voter registration system"; and (3) it is clearly erroneous to reject a signature merely because the signatory's address on the petition did not match the address listed on the statewide voter registration system ("SVRS").

3. We observe that the federal district court for the District of Hawaiʻi has rendered a slip opinion in this case, wherein it held that the one percent signature requirement is not unconstitutional under the First and Fourteenth Amendments to the federal constitution. *Nader v. Cronin*, No. 04–00611, slip op. at 5–7, 2008 WL 336746 (D.Haw. Feb.7, 2008).

Because Appellants present no argument in support of their point of error that Hawaii's signatory requirements are unconstitutional, this point of error is deemed waived. *See* Hawai'i Rules of Appellate Procedure Rule ("HRAP") 28(b)(7) (2005) ("[T]he appellant shall file an opening brief, containing the following sections . . .:(7) The argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on. . . . Points not argued may be deemed waived.").

**B. The Chief Election Officer's Interpretation and Application of Hawaii's Regulatory Framework Prescribing Signatory Requirements Was Not Clearly Erroneous.**

As delineated above, Appellants assert that the Chief Election Officer's interpretation and application of the statute and rules comprising Hawaii's signatory requirements should be liberally construed in favor of Appellants because of the constitutional rights involved in the instant case. Specifically, they assert that the Chief Election Officer's conduct was clearly erroneous in the following ways: (1) it was clearly erroneous to reject signatures merely because they were illegible; (2) "although the Office of Elections require[d] that signatories provide their address and date of birth . . . the examiners did not attempt to validate signatories by cross-referencing that information on the statewide voter registration system"; and (3) it was clearly erroneous to reject a signature merely because the signatory's address on the petition did not match the address listed on the SVRS.

Hawai'i Administrative Rules ("HAR") § 2-51-112 (2004), entitled "Presidential petitions; qualification of signatories[,]" provides, in its entirety:

> To determine whether an individual is qualified to sign a presidential petition, the chief election officer or designated representative shall determine whether the signatory is an active registered voter by checking the statewide voter registration system; provided that a properly executed voter registration form shall be effective if it is received by the clerk and the affiant's name has been entered in the statewide voter registration system on or before the date on which the petition is filed.

HAR § 2-51-113(b) and (d), entitled "Presidential petitions; verification of signatories[,]" provides:

> (b) Upon receipt of a petition containing at least the minimum number of signatures required pursuant to HRS § 11-113(c)(2)(b), the chief election officer or designated representative shall verify whether the signatory is eligible to sign the petition. To be eligible, the signatory must be a registered voter in Hawaii and must appear in the statewide voter registration system as an active registered voter.
>
> (1) If the signatory on the petition exists as an active registered voter in the statewide voter registration system, then the signatory shall be counted;
>
> (2) If the signatory on the petition does not exist as an active registered voter in the statewide voter registration system, then the signatory shall not be counted;
>
> (3) If there are duplicate signatories on a party petition, and the signatory is an active registered voter, then the signatory shall be counted once; and
>
> (4) If the signatory does not provide all of the required information on the petition or *if the information is not legible, then the signatory may not be counted.*
>
> . . . .
>
> (d) The chief election officer may verify that the voter's signature on the petition corresponds with the voter's signature on the voter's registration form. If the signature does not correspond, then the voter's signature on the petition shall not be counted. The chief election officer or designated representative shall indicate on the petition that the voter's signature is invalid because it does not match the signature on the voter's registration form.

(Emphasis added.)

According to the Chief Election Officer's Findings of Fact,

> A signature is deemed: (a) valid if the signatory is listed as "active" in the State

Voter Registration System (SVRS), (b) invalid if the signatory is listed as "inactive" in the SVRS, (c) containing insufficient information if the information submitted by the signatory could not be verified due to insufficient information (i.e. no social security number, date of birth, signature, or could not be read from the record), (d) of no record if the signatory does not appear in the SVRS, (e) to have a different address if the address information on the petition did not match the address in the SVRS, and (f) to be a duplicate if the signatory appeared twice on the petition.

The circuit court found that "the signatory is checked against the [SVRS] to determine if he is an active registered voter." According to the circuit court, because "[t]he SVRS allows for voter records to be pulled up by either social security number or name[,]" "it is critical that signatories comply with the requirement of printing their name in order to avoid illegibility issues, which will result in the record not ... being accessible." The circuit court also found that the petition form contained the following columns that were filled out by the signatory:

> (1) "Print Your Name Here," (2) "Sign the Name Under Which You Are Registered to Vote," (3) "Print the Residence Address at Which You are Registered to Vote," (4) "Birth Date," and (5) "Date Signed." There is additionally a column for the voter's "Social Security Number," however completing this column is optional.

Finally, the circuit court found that "[m]ost signatories did not provide their social security number."

■ Based on the affidavits of Stiver and Porter, two of the Appellants in this case, Appellants allege that it was clearly erroneous for the Chief Election Officer to reject a large number of signatures as illegible without making a serious effort to decipher the names or use other identifying information. HAR § 2–51–113(b)(4), however, clearly provides that the Chief Election Officer "may" not count a signature "if the information is not legible." Moreover, the circuit court "confirmed that many of the names submitted were not legible, as found below-thus, this finding was not clearly erroneous." Additionally, Appellants have not pointed to anything in the record substantiating their

claim; namely, the petitions themselves. *See* HRAP Rule 28(b)(7). Accordingly, we must "sustain [the Chief Election Officer's] findings" because we cannot say "with a firm and definite conviction that a mistake has been made." *Bumanglag,* 78 Hawai'i at 279, 892 P.2d at 472 (block format and citation omitted).

■ Again based on the affidavits of Stiver and Porter, Appellants assert that although the Office of Elections requires that signatories provide their address and date of birth on the petition form, it was clearly erroneous to not attempt to validate signatories by cross-referencing that information on the SVRS. Appellants, however, fail to point to anything in Hawaii's regulatory framework that compels the Chief Election Officer to cross-reference a signatory's address or date of birth to the information within the SVRS. Apparently, the SVRS is set up in such a way that voter records are pulled up by either social security number or name. Providing a social security number on a petition is optional, and the circuit court found that most signatories did not provide one. Accordingly, when a signatory elects not to provide his or her social security number, the Chief Election Officer's only option is to pull the voter's records by his or her name. However, if the name as written on the petition is illegible, the Chief Election Officer "may" not count that signatory. HAR § 2–51–113(b)(4). The circuit court "confirmed that many of the names submitted were not legible, as found below[.]" As such, we cannot say "with a firm and definite conviction that a mistake has been made[ ]" when the Chief Election Officer purportedly did not attempt to validate signatories by cross-referencing other information in the petition with information in the SVRS. *Bumanglag,* 78 Hawai'i at 279, 892 P.2d at 472 (block format and citation omitted).

■ Finally, Appellants assert that HAR § 2–51–113(b) does not authorize invalidating a signature merely because the signatory's address on the petition is different from the address provided in the statewide voter registration system. The Chief Election Officer asserts that the state has an interest in detecting fraudulent or questionable signa-

tures. Pursuant to this interest, the state employs signatory requirements that are necessary to ensure that the signatory is in fact a registered voter.

Nevertheless, Appellants assert that an address change should not disqualify a signatory from signing a petition, inasmuch as HRS § 11–21(c) (2004)[4] does not disqualify a registered voter from voting for the same reason. However, Appellants' reliance on HRS § 11–21(c) is misplaced, inasmuch as HAR § 2–51–113(b)(4) provides that the Chief Election Officer "may" not count a signature "[i]f the signatory does not provide all of the required information on the petition...." One of the columns on the petition form required a signatory to "Print the Residence Address at Which You are Registered to Vote[.]" In light of the state's interest in detecting fraudulent or questionable signatures, we cannot say that it was clearly erroneous for the Chief Election Officer to reject a signature because the signatory provided a different address on the petition form than was provided in the SVRS.

### C. The Circuit Court Did Not Err When It Determined That Appellants Were Provided With a Fair Administrative Hearing

 Appellants assert that because the Chief Election Officer presided over the administrative hearing requested by Peroutka/Baldwin, Appellants did not receive a fair and impartial hearing, and were therefore denied their constitutional right to due process. Appellants also assert that Nader/Camejo were compelled to settle because they could not receive a fair and impartial hearing inasmuch as the Chief Election Officer presided over the hearing. The circuit court held that, pursuant to *Sifagaloa v. Bd. of Trs. of Employees' Ret. Sys.*, 74 Haw. 181, 840 P.2d 367 (1992), Appellants received a fair and impartial hearing because the Chief Election Officer did not have a pecuniary

interest, and his only institutional interest was to ensure that a fair election was conducted.[5]

In *Sifagaloa,* the Board of Trustees of the Employees' Retirement System, upon reviewing a decision submitted by the Medical Board, denied Sifagaloa's request for disability retirement benefits. 74 Haw. at 186–87, 840 P.2d at 370. The same Board of Trustees adjudicated his appeal from the Medical Board's decision. *Id.* at 187, 840 P.2d at 370. After conducting hearings on the matter, the Board affirmed the Medical Board's decision. *Id.* at 187–88, 840 P.2d at 370. On appeal, Sifagaloa asserted that he was denied his constitutional right to due process because the Board's conflicting interests of awarding retirement benefits and preserving the retirement fund brought about an appearance of impropriety whereby their impartiality might reasonably be questioned. *Id.* at 188, 840 P.2d at 370–71. This court determined that administrative agencies are subject to the same "basic requirement of due process" of a "fair trial in a fair tribunal[.]" *Id.* at 189, 840 P.2d at 371 (citations and quotation marks omitted). Even though "a biased decisionmaker is constitutionally unacceptable[,]" it does not necessarily follow "that the disqualification of decision-makers on grounds of actual bias prevents unfairness in all cases." *Id.* (citations, quotation marks, brackets, and ellipsis omitted).

 In observing that "our system of justice has always endeavored to prevent even the probability of unfairness[,]" this court observed "that justice can perform its high function in the best way only if it satisfies the appearance of justice." *Id.* at 189–90, 840 P.2d at 371 (citations, quotation marks, and brackets omitted). This court held, however, that "[a]n appearance of impropriety does not occur simply where there is a joinder of executive and judicial power." *Id.* at 191, 840 P.2d at 372. Instead, "[a]d-

---

4. HRS § 11–21(c) provides:

> (c) Any person whose name appears on the registered voters list whose residence has changed since the last election, and whom the county clerk has not transferred under section 11–20, may apply on a form prescribed by the chief elections officer at the person's new polling place on the day of the election for transfer of registration to the precinct of the new resi-

dence. Any person so transferring voter registration shall be immediately added to the register of the new precinct and may vote only at the new precinct.

5. Appellants appear to assert that *Sifagaloa* is inapposite, even though they themselves rely on language in the case when making their argument. *Sifagaloa* is squarely on point.

ministrators serving as adjudicators are presumed to be unbiased." *Id.* at 192, 840 P.2d at 372. To overcome this presumption, the party asserting impropriety has the burden of establishing a disqualifying interest. *Id.*

In the instant case, Appellants' assert that it was improper for the Chief Election Officer to conduct the hearing when, "by virtue of his role as Chief Election Officer, [he was] responsible for establishing and executing the policies governing the Office of Elections[.]" However, this court clearly held that a mere "joinder of executive and judicial power" is insufficient to constitute an appearance of impropriety. *See Sifagaloa,* 74 Haw. at 191, 840 P.2d at 372. Because Appellants

have failed to show that the Chief Election Officer had a "direct, personal, pecuniary interest" in his exercise of judicial power, *see id.* at 192, 840 P.2d at 372, we hold that the circuit court did not err when it held that Appellants were provided with a fair administrative hearing.

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's April 5, 2005 final judgments.